IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CLAUDE RONNIE | ) | |
| NICHOLSON, *et al.*, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:13-CV-322-WKW |
| | ) | |
| CLINTON P. PICKETT, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

## <u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the court on the following motions filed by Defendant

Oshkosh Corporation ("Oshkosh"): (1) motion for summary judgment (Doc. 81); (2)

a *Daubert* motion to exclude the testimony of Plaintiffs' expert, Charlie Miller (Doc.

86); and (3) a motion to strike the affidavit of Charlie Miller (Doc. 121).[1]  For the

reasons discussed, the court will deny Oshkosh's motions to exclude and to strike and

will grant in part and deny in part Oshkosh's motion for summary judgment.

---

[1] Defendant Clinton P. Pickett also has filed a motion for summary judgment (Doc. 89) and motion to dismiss for lack of jurisdiction (Doc. 131).  These motions are pending.  On February 19, 2016, Plaintiffs and Pickett notified the court that they "have reached a pro tanto settlement as to the claims and causes of action brought against . . . Pickett." (Doc. 133).  The parties requested additional time "to submit documents necessary to finalize and complete the pro tanto settlement."  (*Id.*).  The court subsequently ordered Plaintiffs and Pickett to file a joint stipulation of dismissal on or before March 23, 2016.  (Doc. 134).

# I.  BACKGROUND AND OPERATIVE FACTS[2]

This lawsuit arises out of a motor vehicle accident.   On April 29, 2011, Plaintiffs Claude and Myra Nicholson were traveling in their passenger vehicle near Enterprise, Alabama, when a large, unmanned military vehicle rolled down a hill and into their path.   The two vehicles collided, and Plaintiffs were injured.

The HEMTT[3] M1120 motor vehicle that is the subject of this case was manufactured by Oshkosh in October of 2009.  (Doc. 108-1 at p.1; 108-4 at p. 2).   In or around November, 2010, the HEMTT was delivered to the Alabama National Guard in Montgomery, Alabama.   (Doc. 108-1 at p. 1).   At or near the time of delivery, the HEMTT underwent an inspection that revealed a defect.  (Doc. 108-2).   Specifically, an inspection report identified as "PM HTV - Oshkosh Equipment Deficiency Report" found that the vehicle's spring brake valve was defective.  (*Id.*).   The inspection report further describes that the following corrective action was taken:

---

[2] The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir.1994). The court has gleaned these statements from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).

[3] HEMTT stands for Heavy Expanded Mobility Tactical Truck.  An illustration of a HEMTT is in the court's record at Doc. 83-8, p. 4.

"Parts ordered by FSR 11-02-10 and installed." (*Id.*). The odometer reading on the HEMTT, at the time of inspection, was 71.6 miles. (Doc. 108-1 at p. 1).

Plaintiffs have included as part of the record a document entitled "Motor Vehicle Safety Plan" ("Safety Plan"). The Safety Plan, which was adopted by the Alabama National Guard, references the procedure of "chocking" as follows:

> Ensure that Army wheeled vehicles are equipped with and drivers use chock block pairs when parked on inclines or when maintenance is being performed. If chock blocks pairs have not been issued, they may be made locally using 8-inch wood stock cut at 45 degree angles. Chock blocks will be used as pairs, placing one block in front of and one block behind the tire being chocked.

(Doc. 109-3 at p. 6). In a document entitled "Operator Maintenance [-] Operate Parking Brakes," Oshkosh set forth warnings regarding the need to chock the wheels on HEMTT vehicles in certain circumstances. (Doc. 83-8). Specifically, the operations manual warned that, "[w]hen parking on an incline, if vehicle is equipped with C-Kit armor, ensure vehicle remains stationary before exiting the cab [and] [c]hock wheels immediately." (*Id.* at p. 1). With regard to installing wheel chocks, the operations manual noted that the vehicle "is equipped with four wheel chocks," and instructed the operator to: (1) "[a]lways chock tires if vehicle is shut down on uneven terrain;" (2) [a]lways chock tires if vehicle parking brake is inoperative;" and (3) [e]nsure local policy for chocking vehicle tires is followed." (*Id.* at p. 4).

3

In late April of 2011, Alabama was suffering the immediate aftermath of a string of especially severe, deadly tornados and storms.  The storms garnered national press attention, resulted in a presidential visit to Alabama, and were among the worst natural disasters in the state's history.  There are towns that simply no longer exist as they did the day before the storms, having been laid completely to waste.  The City of Tuscaloosa, Alabama, in the western part of the state was especially damaged.

A state of emergency was declared, and the Governor mobilized the Alabama National Guard to provide relief to areas damaged by the storm.  Sergeant Clinton P. Pickett and Specialist Xavier Clayton,[4] who are members of the 131st Forward Support company of the Alabama National Guard based in Enterprise, Alabama, were among the Guard members called to duty.  Pickett, who was an enlisted soldier and not an officer, outranked Clayton.  They were among those soldiers who were to travel to Tuscaloosa.  Sometime after the subject  HEMTT arrived in Montgomery, it was transferred to the 131st Forward Supply Company in Enterprise.  (Doc. 108-5 at p. 2).  The distance from Montgomery to Enterprise is approximately eighty-five (85) miles.

On April 29, 2011, the day of the collision, Pickett was assigned the responsibility of driving the HEMTT from Enterprise to Tuscaloosa, Alabama.  (Doc.

---

[4] Clayton is not a party to this lawsuit.

4

108-6 at p. 2). Clayton was assigned to be Pickett's assistant driver. (*Id.* at p. 3). Pickett had experience driving large commercial vehicles, including a different HEMTT frame, but he had not driven this specific HEMTT model and was not licensed to do so. (*Id.* at pp. 2, 8). At the time the Guard assigned the HEMTT to Pickett, he raised his lack of training and his license issue with the assigning Guard member. The Guard member's response was to "fix" Pickett's driver's license to show HEMTT certification. (*Id.* at p. 2). While having previous experience with other large commercial vehicles, Clayton had no experience with a HEMTT. (Doc. 108-7 at p. 2).

After the HEMTT was assigned to Pickett and Clayton, Pickett found the HEMTT in the motor pool and performed an inspection that included checking fluid levels and walking around the vehicle. (Doc. 108-6 at p. 3). Pickett started the HEMTT's engine and was ground guided from the vehicle's parked position to the gate leading from the motor pool area of the National Guard facility. (*Id.*). After Pickett stopped the vehicle on a concrete surface at the top of a hill near the gate, he initiated the HEMTT's parking brake. (*Id.* at pp. 3-4; Doc. 108-7 at p. 3). Clayton confirmed that the parking brake was set when Pickett stopped the HEMTT at the gate, as he observed Pickett applying the brake and heard the audible sound associated with the parking brake's application. (Doc. 108-7 at p. 3).

5

While parked at the gate,  Pickett directed Clayton to go into the Armory and retrieve a fuel card so they could obtain fuel for the HEMTT.   (Doc. 108-6 at p. 3). Pickett stayed inside the HEMTT and waited for Clayton to return.   (*Id.*).  After waiting roughly twenty minutes,  Pickett put the HEMTT's transmission in neutral, took the actions he thought were necessary to set the parking brake, and left the HEMTT to look for wheel chocks "from a string of trailers on the fence and other vehicles close by," but he found none.  (*Id.*).  He returned to the HEMTT, assured himself that the vehicle was in neutral and the parking brake was engaged insofar as he could discern, and he left the HEMTT with the engine running to go find Clayton. (*Id.* at pp. 3, 10).

Pickett succeeded in locating his assistant driver, but the Armory was not yet distributing fuel cards.  (*Id.* at p. 3).  Pickett was imminently expected at a sergeant's meeting, and he instructed Clayton to return to the HEMTT to turn off the engine.  (*Id.* at p. 4).  After returning to the vehicle and while turning off its engine, Clayton did not touch the setting for the parking brake, and he only pressed the engine control mechanism. (Doc. 108-7 at p. 5).

Fifteen minutes into the sergeant's meeting, a loud booming noise was heard and the power failed.  (Doc. 108-7 at p. 7).  A soldier ran into the meeting room and informed the group that a vehicle had rolled down a hill and struck another vehicle.

6

(*Id.*).[5]  Pickett went outside of the Armory with his fellow soldiers where he learned that his unmanned HEMTT was the vehicle that rolled down the hill.  (Doc. 108-6 at p. 5).  Pickett observed two individuals, later identified as Plaintiffs, being removed from their vehicle and carried to the armory side of the road.  (*Id.*).  The HEMTT odometer reading was 158.6 miles immediately after the collision.  (Doc. 108-4 at p. 2).  When the HEMTT was retrieved after the collision, a soldier provided testimony that the parking brake was still set and that he had to start the HEMTT's engine so that the brake could be disengaged to allow the vehicle to be towed.  (Doc. 111-4 at p. 5).

Pickett testified that the accident more than likely would not have happened had the wheel chocks been available and used.  (Doc. 83-1 at pp. 5-6).  However, the corporate representative for Oshkosh, Jack Lackore, testified at his deposition that the parking brake system should have held the HEMTT in place where it was parked if it functioned properly.  (*See* Doc. 108-8 at p. 8).  The corporate representative specifically testified that the grade on which the vehicle was parked was "slight" and that it was less than a 20 percent grade.  (*Id.*).  The witness also testified as follows:

---

[5] The parties use the verb "rolled" to describe the action the HEMTT took to get from the top of the hill to the bottom, and the word is repeated here for description purposes only.  No finding of fact is made that the vehicle "rolled" — *i.e.*, that the wheels turned while the vehicle was in motion versus, for example, that the wheels remained locked by the brake and the vehicle slid down the hill.  For purposes of the motions at bar, a precise description of how the HEMTT traveled down the hill is unnecessary.

> Q:     Now, the FMVSS 121, does that mean that [the vehicle] should hold
> there [where it was parked] without chocks?
>
> A:     Yes.

(Doc. 108-8 at p. 8; *see also* Doc. 108-8 at p. 9 ("I would have expected the HEMTT,

if the parking brakes had been applied, to stay there.").  Lastly, Oshkosh's corporate

representative agreed with Plaintiffs' counsel at the deposition that one of two things

occurred to cause the HEMTT to roll down the hill and into the path of Plaintiffs'

vehicle: either the brakes were not applied or the parking brake was applied and did

not "function properly."  (*Id.* at p. 6).

## II.  PLAINTIFFS' CLAIMS AGAINST OSHKOSH

Plaintiffs have asserted three claims against Oshkosh in their First Amended

Complaint.  (Doc. 67).  In Count II, Plaintiffs claim that Oshkosh "negligently,

recklessly or wantonly researched, formulated, designed, manufactured, packaged,

labeled, sold, distributed, inspected and/or repaired the HEMTT LHS vehicle,

including the brake system and other component parts thereof, which is believed to

have caused or contributed to cause the injuries and damages to" Plaintiffs.  (Doc. 67

at p. 6).  In Count III, Plaintiffs claims that Oshkosh, Pickett, and other defendants

"combined and concurred to proximately cause the Plaintiffs' injuries and damages."

(*Id.*).[6] Finally, in Count IV, Plaintiffs assert a cause of action against Oshkosh under the Alabama Extended Manufacturers Liability Doctrine ("AEMLD").  (*Id.* at p. 7).

## III.  DISCUSSION

**A.     Motion to Exclude the Testimony of Plaintiffs' Expert**

**1.     General Legal Principles**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles; and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

---

[6] One of the defendants, Bendix Commercial Vehicle Systems, LLC ("Bendix"), filed a summary judgment motion on July 3, 2015.  (Doc. 94). Plaintiffs subsequently filed a notice of settlement with Bendix, and its summary judgment motion was dismissed as moot.  (Doc. 129).

In *Daubert*, the Supreme Court emphasized that Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589 & 597, 113 S.Ct. 2786; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786)).  This gatekeeping responsibility is the same when the trial court is considering the admissibility of testimony based upon "'technical' and 'other specialized knowledge.'"  *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed. R. Evid. 702).

In light of *Daubert's* "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether: "(1) [T]he expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs. *See id.* "The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion," *id.*, and the proponent must meet its burden by a preponderance of the evidence. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (In addition, we note that "[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (citing *Daubert*, 509 U.S. at 592, n. 10, 113 S.Ct. 2786)).

As to qualifications, "experts may be qualified in various ways," including by scientific training, education, and experience. *Frazier*, 387 F.3d at 1260. When evaluating the reliability of scientific expert testimony, the [district court] must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786. Factors that may bear on the reliability of expert testimony include (1) whether the expert's theory can be and has been tested, (2) whether the theory has been subjected to peer review and publication,

(3) whether the known or potential rate of error of the methodology is acceptable, and

(4) whether the theory is generally accepted in the proper scientific community. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593-94, 113 S.Ct. 2786).   These factors are not definitive, however.   Other potentially relevant factors, depending upon the facts, include "whether the proposed expert ruled out other alternative explanations" and "whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (collecting cases).   In short, trial courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167.   At the same time, trial courts must remain mindful that "*Daubert* does not require certainty; it requires only reliability." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n. 10 (11th Cir. 2010).   The focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786.

The Supreme Court further recognizes that *Daubert's* general holding applies not only to testimony based on scientific knowledge, but also to testimony based on "technical" or any "other specialized knowledge." *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167 (quoting Fed. R. Civ. P. 702).   A district court is free to decide that any

such nonscientific expert testimony is reliable based upon the expert's "personal knowledge or experience." *Id.* at 150, 119 S.Ct. 1167. "Thus, even where an expert witness posits an experience-based opinion, as opposed to a purely scientific opinion, 'a trial court may consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability.'" *Senn v. Carolina Eartern, Inc.*, 111 F. Supp. 2d 1218, 1221 (M.D. Ala. 2000) (quoting *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167). While recognizing that a district court has broad latitude in deciding how to determine reliability, it must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167).

Finally, whether the expert testimony will assist the trier of fact in understanding the evidence or a fact in issue "goes primarily to relevance." *Id.* at 591, 113 S.Ct. 2786. "Expert testimony which does not relate to any issue in the case is not relevant and, *ergo*, non-helpful." *Id.* (citation and internal quotation marks omitted). "The 'basic standard of relevance . . . is a liberal one,' but if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp.*, 582 F.3d at 1232 (quoting *Daubert*, 509 U.S. at 591-92, 113 S.Ct. 2786). Hence, under this third inquiry, "even

if an expert's testimony [is] admissible under the first two prongs of the *Daubert* analysis, it may still be insufficient to create an issue of fact to overcome summary judgment." *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1232 (N.D. Ala. 2011); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (District courts may reject expert testimony that is based on sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered.").

In the end, the court's gatekeeping role under *Daubert* "is not intended to supplant the adversary system or the role of the jury." *Allison*, 184 F.3d at 1311. Where the basis of expert testimony satisfies Rule 702, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

## 2. The Opinions and Testimony of Plaintiffs' Expert

Plaintiffs retained Charlie Miller, owner of Merigold Automotive, Inc., as their expert. (Doc. 108-3 at ¶ 1). Miller has "worked in the automobile and commercial vehicle repair industry since 1969" and has "participated in the investigation and failure analysis of several hundred motor vehicle accidents involving design and manufacturing issues." (*Id.*). Miller initially inspected the HEMTT vehicle on

December 6, 2012. (Doc. 111-9 at p. 2). In preparing his expert report dated February 6, 2015, Miller reviewed the complaint, as well as numerous documents, transcripts, vehicle inspection report, photographs, and video from Oshkosh's May 18, 2011 inspection of the HEMTT. (*Id.*). Miller reached the following conclusions in his expert report:

(1)     the air brake system, including the parking brake components, valves, lines and other component parts, are substantially similar to the air brake systems found on any similar nonmilitary commercial vehicle.

(2)     the spring brake valve failed by allowing compressed air into the spring brake chamber sufficient to release the spring brakes that were otherwise properly set and correctly applied by Pickett.

(3)     the failure of the spring brake valve was the result of debris or other material that was allowed to remain in the brake system during the manufacture of the components of the spring brake system, in the assembly of the components, and/or as a result of the design of the subject spring brake system, or both.

(4)     the fact that the spring brake valve was determined in a pre-delivery inspection to be defective is consistent with these findings.

(5)     neither the remedy nor the repair of the pre-inspection issues with the spring brake valve has been identified or made available.

(*Id.* at pp. 4-6).

Miller subsequently participated in a second, more detailed inspection of the HEMTT vehicle on March 18, 2015. (Doc. 108-3 at ¶ 2). At his deposition conducted

on April 16, 2015, Miller testified that he conducted various tests and operations on the HEMTT and observed nothing out of the ordinary with regard to the air brake system, which was working properly at the time of the tests.  (Doc. 88-1 at p. 12). Miller nevertheless testified with regard to the incident at issue that: (1) either the dash valve or the SR-7 modulating valve was malfunctioning and thereby allowing air to return to one of the chambers; (2) to the extent he believes debris was allowed to remain in the brake system causing a valve malfunction, it would be a manufacturing defect; and (3) chock blocks were unnecessary on level ground where brake systems similar to the one used by the HEMTT were working properly.  (*Id.* at 88-1 at pp. 16-17, 20, 22).

Following his detailed inspection and deposition, Miller executed an affidavit which was submitted as evidence in response to Oshkosh's summary judgment motion.  (Doc. 108-3).  Based on his extensive experience in the automobile and commercial vehicle repair industry, and after conducting his inspections and reviewing the evidence in this case, Miller determined that:

> The parking spring brake system for the HEMTT uses a spring system that is referred to as a spring brake.  The spring brake system and components used in the HEMTT are similar to, if not exactly like, the spring brake system utilized in most heavy commercial trucks.  The vehicle locks the brake and holds the truck stationary by releasing air from the spring brake chambers.  Once this air is released from the spring brake chambers it is impossible for the brake to be released or for the truck to move until compressed air is reintroduced into the spring

brake chambers of a sufficient capacity to compress the springs and release the brake.  The only way compressed air can reach the spring brake chambers is through the valve controlling the parking brake system.  If the driver or operator does not move the valve manually to apply this air, and the air gets to the spring brake chamber to release the brake, there has to be a defective and improperly operating spring brake valve to allow air to get into the chamber.

(*Id.* at ¶ 3).[7]

Miller reaffirmed in his affidavit his essential conclusions set forth in his initial expert affidavit that: (1) the evidence shows that the parking brakes were properly set and rechecked, and there otherwise is no evidence that compressed air was reintroduced to the brake chambers by human interventions; (2) the spring brake valve failed by allowing compressed air into the spring brake chamber sufficient to release the spring brakes that were otherwise properly set and correctly applied by Pickett; and (3) "this failure was the result of debris or other material that was allowed to remain in the brake system during the manufacture of the components of the spring brake system or in the assembly of the components."  (*Id.* at ¶ 6, 9).  Miller further explained his belief that:

the debris was expelled from the system during the inspection of the HEMTT performed by Oshkosh shortly after the accident on May 18, 2011.  During this inspection, compressed air was introduced into the air brake system and released many times.  This acted as a flushing

_____

[7] Mr. Miller's conclusion regarding his analysis of the spring brake system in the HEMTT essentially echo his conclusions stated in his initial report.  (*See* Doc. 111-9 at p. 3).

mechanism for the system and would have expelled any debris causing a malfunction of the spring brake valve.  Neither the [Plaintiffs] nor their representatives were invited to attend and observe this destructive inspection.

(*Id.* at ¶ 9).[8]

Miller again recognized that the spring brake valve in the HEMTT was determined to be defective in its pre-inspection delivery and that he did not believe the problems associated with the defective spring brake valve were ever resolved before the incident involving Plaintiffs on April 29, 2011.  (*Id.* at ¶ 11).  Specifically, Miller concluded that:

The condition of the vehicle indicates the spring brake system and associated component parts were the same factory installed parts and had not been modified.  The factory installed SR-7 valve manufactured by Bendix and found to be defective during the pre-delivery inspection appears to be the same valve present on the HEMTT at the time of my inspection.  The SR-7 valve present on the HEMTT on April 29, 2011, I covered with the same factory applied CARC paint covering the exterior of the HEMTT.  There are no tool marks present on the supply lines connecting to the SR-7 to indicate that the valve was replaced following the November, 2010 inspection when the spring valve was determined to be defective and not operating properly.

(*Id.* at ¶ 11).

_____

[8] After the collision, but before the lawsuit was filed, Oshkosh undertook what has been described as "destructive testing" on the brake system in the HEMTT, and certain parts were replaced.  Neither Plaintiffs nor their representatives were invited to participate in the testing or were present.  Moreover, the parts that were replaced or destroyed were not preserved, and Plaintiffs were not permitted an opportunity to conduct an independent inspection of their own.  Plaintiffs have not moved for an adverse inference of fact with respect to the evidence that was destroyed.  Therefore, no adverse inference is afforded for purposes of the pending motions.

Miller then observed on film several reenactments of the accident sequence that were conducted "in an area generally accepted as the area where the subject truck was parked by Pickett, and in proximity to the concrete pad expansion joint." (*Id.* at ¶ 14). Miller concluded after reviewing the reenactments that "[i]t is likely the truck was parked either on, or to the left of, the expansion joint, and remained parked there until enough air leaked into the brake chamber to release the brakes over the approximate fifty (50) minute period described by Pickett, thereby allowing the truck to then roll down the hill and cause the accident made the basis of this lawsuit." (*Id.* at ¶ 18).

### 3. Oshkosh's and Plaintiffs' Contentions

In its motion to exclude expert testimony, Oshkosh acknowledges that Miller is qualified to testify about brakes based on his overall experience as a mechanic taken together with the courses he took before starting his career. (Doc. 87 at p. 10 n.3). Oshkosh instead contends that Miller's methods are unreliable and that his speculative testimony will not assist the jury. (*Id.* at pp. 11, 16).

On the issue of reliability, Oshkosh contends that Miller has:

performed *no* independent tests to confirm his hypothesis, and his entire investigation into the cause of this accident is limited to two visual inspections of the HEMTT and its brake system – inspections that demonstrated proper operation of the HEMTT and its brake system. This thread-bare foundation for his theory is not enough to demonstrate reliability.

(*Id.* at 13 (emphasis in original)).  Oshkosh further contends that Miller has failed "to explain how his experience and personal knowledge 'from reading different books' substantiates his conclusion that debris in the brake valves caused this accident."  (*Id.* at 14).  After citing the fact that Miller's theory has neither been tested nor "been subjected to any sort of peer review or publication," Oshkosh asserts that "it is impossible to determine any error rates for his investigative techniques or whether these techniques would be generally accepted in the scientific community."  (*Id.* at 14-15).  According to Oshkosh, the lack of reliability is demonstrated by Miller's deposition testimony with regard to his unfamiliarity with the HEMTT vehicle and its brake system, his lack of experience in never offering an expert opinion on the design and manufacture of a military truck like the HEMTT, and his lack of both publishing papers and teaching industrial courses.  (*Id.* at pp. 15-16).

Oshkosh next asserts that Miller's unreliable testimony will not assist the jury as it "does not 'fit' with the facts of the case" and is "imprecise, unspecific, and not based in fact."  (*Id.* at p. 17).  Specifically, Oshkosh contends that:

> First, Miller's theory is belied by the facts and admissions of the witnesses in this case.  Clinton Pickett, the driver of the HEMTT, testified that but for his failure to place wheel chocks under the HEMTT, this accident would not have happened.  Second, Miller admits that placing wheel chocks is required by both the Army and Oshkosh.  Third, Miller admits that he never found any debris in the brake valves.  Fourth, Miller does not know which valve allegedly malfunctioned.  Fifth, all of his inspections and testing demonstrated the brake system was operating

20

properly.  Sixth, despite his theory of the cause of the accident, he has no evidence of a manufacturing defect.

(*Id.*).   According to Oshkosh, Miller's testimony "offers nothing more than an insufficient and conclusory explanation for the accident" and otherwise "is nothing more than a collection of speculative conclusions."  (*Id.* at p. 18).

Plaintiffs counter that Miller's opinions are sufficiently reliable by first explaining that his reliance "on deposition testimony and reports and analyzing photographs is a reliable and accepted methodology under *Daubert*."  (Doc. 110 at p. 13).  Despite the fact that Oshkosh's "destructive testing" rendered it impossible for Miller to recreate the spring brake failure," his opinion regarding the proper cause of the accident is offered "within a reasonable degree of certainty based upon [his] education, training, and service over the past 45 years."  (*Id.* at 16).  Contending that Miller's methodology was sufficiently reliable, Plaintiffs cite his review of the various reenactments, his physical assessment of the HEMTT and its air brake system, and his long-time experience and work as a mechanic.  (*Id.* at pp. 17-18).      Arguing that Miller's testimony will assist the jury, Plaintiffs maintain that "Miller's extensive knowledge is clearly beyond a layman's understanding and is based on 45 years as a mechanic."  (*Id.* at 22).  Contrary to Oshkosh's contention that  Miller's testimony is mere speculation, Plaintiffs state that "it is the only logical mechanical and/or scientific conclusion that could possibly be reached based on the evidence of record."

(*Id.*).  According to Plaintiffs, Miller's testimony will assist the trier of fact: (1) "in determining how the braking system on the HEMTT works and ultimately failed;" (2) by explaining "how the brake locks and hold[s] the truck stationary by releasing air from the spring brake chambers;" (3) by explaining "how compressed air reaches the brake system through a valve system to compress the spring and ultimately release the brake;" and (4) by explaining how there has to be present a defective and improperly operating spring valve to allow air to get into the chamber in the absence of any human involvement.  (*Id.* at 23).  To the extent Oshkosh points to the lack of any debris currently present in the HEMTT's braking system, Plaintiffs contend that such evidence goes to the weight of Miller's testimony and not its reliability.  (*Id.*).

### 4.    Analysis

### Reliability

Is the methodology employed by Miller to reach his conclusions sufficiently reliable?  Oshkosh has conceded that Miller is qualified to render an expert opinion based on his extensive background, training, and experience in the automobile and commercial vehicle repair industry.  Miller's extensive qualifications, while by no

means a guarantor of reliability, "may bear on the reliability of his proffered testimony." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).   The testimony proffered by Miller in his expert report, deposition, and affidavit is based on his experience, as well as the following methodology employed:

(1)   reviewed the complaint, as well as numerous documents, transcripts, vehicle inspection report, photographs, and video from Oshkosh's May 18, 2011 inspection of the HEMTT.

(2)   conducted two inspections of the HEMTT vehicle with the first inspection conducted on December 6, 2012, and the second more detailed inspection conducted on March 18, 2015.

(3)   performed various tests and measurements, in connection with the second inspection, on the HEMTT's braking system; and

(4)   observed on film several reenactments of the accident sequence.

(Doc. 111-9 at pp. 1-2; Doc. 108-3 at ¶¶ 2, 14, and 18; Doc. 88-1 at pp. 6-13).

When considering Miller's experience and the methodology used by him, the court finds that his expert testimony is sufficiently reliable.   Oshkosh's own corporate representative testified that one of two things occurred to cause the HEMTT to roll down the hill and into the path of Plaintiffs' vehicle: either the brakes were not applied or the parking brake was applied and did not "function properly." (Doc. 108-8 at p. 6).   As part of his methodology outlined above, Miller eliminated the first theory as his review of the pertinent evidence revealed that the parking brake was properly

applied and no human interaction otherwise occurred to release the brakes prior to the HEMTT rolling down the hill.

Oshkosh further offers the alternative theory that, based on Pickett's testimony, the accident was caused by Pickett's failure to place wheel chocks under the HEMTT. However, Miller explained at his deposition that the wheel chocks were unnecessary on relatively level ground where brake systems similar to the one used by the HEMTT were working properly.  (Doc. 88-1 at 20).  Miller's rejection of this theory as the cause of the accident is supported by Oshkosh's corporate representative who testified that wheel chocks were unnecessary as he would have expected the HEMTT to stay if the parking brakes had been applied.  (Doc. 108-8 at p. 9).  Thus, Miller's testimony provides sound reasons for rejecting alternative explanations as to what caused the HEMTT to roll down the hill.  *See Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1342 (11th Cir. 2001) (recognizing that the expert's ability to settle on a cause "through a process of eliminating alternative possible causes is, by a preponderance of the evidence, a reliable one").

Oshkosh further contends that Miller's expert testimony is not sufficiently reliable because he has performed no test to confirm his hypothesis, he has failed to show that his theory has been subjected to any sort of peer review or publication, and all of his inspections and testing demonstrated the brake system was operating

24

properly. (Doc. 87 at pp. 11-16). Miller attempted to confirm his hypotheses by conducting various tests and operations on the HEMTT during his April 18, 2015 inspection. (Doc. 88-1 at p. 12). According to Miller, however, he was unable to detect any debris within the brake system during his inspections of the HEMTT, or any other abnormality, as any such debris had more than likely been expelled from the system during the inspection of the HEMTT performed by Oshkosh shortly after the incident on May 18, 2011. Even though he was unable to test the HEMTT in its condition immediately following the incident, Miller's analysis of the relevant evidence included reviewing several reenactments of the accident sequence on film. Miller's analysis of the film served to support his theory that a manufacturing defect in the spring brake valve allowed air to slowly leak into the brake chamber and cause the brakes to release after the passage of time. (Doc. 108-3 at ¶¶ 14-18).

While Oshkosh also attacks the reliability of Miller's opinions as to his lack of experience with the HEMTT vehicle, Miller specifically remarks that the spring brake system and components used in the HEMTT are similar to, if not exactly like, the spring brake system utilized in most heavy commercial trucks. (*Id.* at ¶¶ 3, 12). Based on his experience in the commercial vehicle repair industry and review of the pertinent depositions, films, and reports, Miller outlines with sufficient reliability the braking process in such a large commercial vehicle and explains in detail why the

brake system in the HEMTT more likely than not failed due to a manufacturing defect caused by debris remaining in the braking system. *See Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) ("Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony," and court has discretion to deem expert testimony reliable based upon personal knowledge or experience); *Clay v. Ford Motor, Co.*, 215 F.3d 663, 668-69 (6th Cir. 2000) (recognizing that reliance on depositions, reports, statements, and photographs is a reliable and accepted methodology under *Daubert*); *Reid v. BMW of North America*, 430 F. Supp. 2d 1365, 1370 (N.D. Ga. 2006) (holding that the expert's testimony based on his own personal experiences and analysis of the evidence are deemed reliable and any attacks against such testimony go toward the weight of the testimony and not its admissibility).

Miller's expert testimony, as contained in his report, deposition, and affidavit, is not without its flaws.  In both his expert report and affidavit, Miller unequivocally states that the HEMTT's spring brake valve failed and that it failed as the result of a manufacturing defect due to debris that was allowed to remain in the brake system. (*See* Doc. 108-3 at ¶ 9; Doc. 111-9 at p. 5).  Miller was not quite so emphatic in his deposition as he was unable to identify the specific valve that malfunctioned or identify the manufacturing process that introduced debris into the braking system.

(Doc. 88-1 at pp. 16, 18, 24).  Furthermore, in contrast to his report and affidavit, Miller identifies the possibility that a part—such as a piston—could have been defective.  (*Id.* at 17).  Miller, however, then proceeded to reject this type of manufacturing defect as it "more likely than not would still be manifesting itself, and it would still be malfunctioning."  (*Id.*).

The court nevertheless finds that Miller's deposition testimony, as a whole, is consistent with his report and affidavit in that he generally opines the accident was caused by a manufacturing defect due to debris remaining in the system that led a spring brake valve to fail.[9]  To the extent that Oshkosh has various concerns with respect to Miller's expert testimony, such arguments go to the weight, rather than the admissibility, of his testimony.  *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) ("[W]eaknesses in the underpinnings of the expert's opinions go to its weight rather than its admissibility.").

## Assist the Trier of Fact

---

[9]  Oshkosh moves to strike Miller's affidavit as a "sham" affidavit.  (Doc. 121). However, as discussed below, this motion is due to be denied.

The court next considers the third part of the *Daubert* inquiry – whether the expert's testimony assists the trier of fact.  An expert's testimony will assist the jury when it offers something "beyond the understanding and experience of the average citizen."  *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985).  Miller's testimony, which is based on his extensive experience and knowledge in the field of commercial vehicle repair and his analysis of the relevant materials in this case, relates to determining the precise cause for why the HEMTT rolled down the hill and will clearly assist the jury in making such a determination.  Accordingly, Oshkosh's motion to exclude Miller's testimony is due to be denied.

## B.    Motion to Strike Mr. Miller's Affidavit

Oshkosh moves to strike Miller's affidavit that was attached to Plaintiffs' summary judgment motion.  (Doc. 121).  Contending that Miller's affidavit is a "sham" affidavit, Oshkosh cites several discrepancies between Miller's deposition and his testimony provided in the later-filed affidavit.  (Doc. 121 at pp. 5-10).  According to Oshkosh, Miller's affidavit contains different opinions consisting of purportedly new testimony that:  (1) identifies the specific valve in the braking system with the manufacturing defect; (2) describes the failure as stemming from debris that was allowed to remain in the brake system; (3) concludes without equivocation that the brake system's failure was the result of debris in the system causing the malfunction;

and (4) attempts to offer theories regarding the accident despite his claim in the deposition that he was not an accident reconstruction expert.  (*Id.*).

The court "may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 656 (11th Cir. 1984).  The "sham affidavit rule," however, should be applied sparingly. *Kernal Records Oy v. Mosley*, 694 F.3d 1294, 1303 n.6 (11th Cir. 2012).  "[I]n light of the jury's role in resolving questions of credibility," a district court should not strike an affidavit merely because "it is at odds with statements made in an earlier deposition." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).  An affidavit may be deemed a "sham" only when "clear answers to unambiguous questions . . . [contradict,] without explanation, previously given clear testimony." *Van T. Junkins*, 736 F.2d at 657.  "Every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986).

A review of Miller's affidavit reflects that his opinions challenged by Oshkosh regarding the precise cause of the accident reaffirm his opinions provided in his expert report that pre-dated the deposition testimony.  In any event, none of the opinions offered in Miller's affidavit directly contradict his opinions offered in the

deposition testimony.  To the extent that his deposition testimony is different from both his expert report and affidavit, such discrepancies may "create an issue of credibility or go to the weight of the evidence." *Tippens*, 805 F.2d at 953. Accordingly, Miller's affidavit should not be stricken pursuant to the sham affidavit rule.

### C.    Oshkosh's Motion for Summary Judgment

#### 1.    Standard of Review

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation omitted); *see also* Fed. R. Civ. P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine [dispute]

as to any material fact and that the movant is entitled to judgment as a matter of law.").[10]

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 477 (1986). The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; Fed.R.Civ.P. 56(e)(2) ("When a

---

[10] Effective December 1, 2010, the language of Rule 56(a) was amended. The word "dispute" replaced the word "issue" to "better reflect [ ] the focus of a summary-judgment determination." Fed. R. Civ. P. 56(a), Advisory Committee Notes, 2010 Amendments.

motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine [dispute] for trial."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence . . . that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249–250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576–1577 (11th Cir. 1990) (quoting *Anderson*, *supra*).

All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Conclusory allegations based on subjective beliefs, however, are insufficient to create

a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Importantly, however, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, No. 08-801133, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment."). In particular, summary judgment is inappropriate where the court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (noting a court must not weigh conflicting surveillance nor make credibility determinations when ruling on a motion for

33

summary judgment); *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Rule 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility).

### 2.    Claims against Oshkosh

### AEMLD

The court will first consider Plaintiffs' claim against Oshkosh under the AEMLD.  The Alabama Supreme Court first announced the adoption of the AEMLD in *Casrell v. Altec Industries, Inc.*, 335 So. 2d 128 (Ala. 1976).  Under this doctrine, "a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a [m]atter of law." *Id.* at 132.  To establish a prima facie case under the AEMLD, Plaintiffs must show that: (1) Oshkosh manufactured, designed, or sold a defective, unreasonably dangerous product; (2) that the product reached the consumer in substantially the same condition in which it was sold; and (3) that the product injured the consumer when it was put to its intended use. *Beam v. Tramco, Inc.*, 655 So. 2d 979, 981 (Ala. 1995).  Furthermore, "it makes no difference whether it is

dangerous by design or defect.  The important factor is whether it is safe or dangerous when the product is used or was intended to be used." *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1276 (M.D. Ala. 1999) (quoting *Casrell*, 335 So. 2d at 133).

In *Townsend v. General Motors Corp.*, 642 So. 2d 411 (Ala. 1994), the Alabama Supreme Court recognized that:

> [T]he manufacturer of a product is not an insurer against all harm that may be caused by the product, and the manufacturer or designer is not obligated to produce an accident-proof or injury-proof product. Likewise, the failure of a product does not presuppose the existence of a defect.  Proof of an accident and injury is not in itself sufficient to establish liability under the AEMLD; a defect in the product must be affirmatively shown.

*Id.* at 415.  To survive summary judgment, therefore, a plaintiff must present "substantial evidence" to establish a defect under the AEMLD.  *Id.* at 418.  "Pure speculation or conjecture will not suffice."  *Cooper*, 76 F. Supp. 2d at 1276.  "When the product in question is of a complex and technical nature such that a lay juror could not, in the absence of expert testimony, infer that a defective condition of the product caused the resulting injury to a plaintiff, expert testimony is a necessary component of a plaintiff's case."  *Id.* (citing *Townsend*, 642 So. 2d at 415 and *Brooks v. Colonial Chevrolet-Buick*, 579 So. 2d 1328, 1333 (Ala. 1991)).

While it is necessary to present "substantial evidence" in support of a defect, a plaintiff "need not have evidence specifically identifying the exact nature of the defect." *Rudd*, 127 F. Supp. 2d at 1345.

> From its earliest formulations, the AEMLD has been construed as allowing plaintiffs to show a product was defective or unreasonably dangerous despite a lack of direct evidence identifying a specific defect: a defect is that which renders a product unreasonably dangerous, i.e., not fit for its intended purpose . . . . [I]t makes no difference whether [the product] is dangerous by design or defect. [P]roof of the specific defect, i.e., the exact act, omission, process, construction, etc., resulting in the product's failing its intended use, is not required. If a product is unreasonably dangerous, it is necessarily dangerous, it is necessarily defective, and the consumer should not be required to prove defectiveness as a separate matter.

*Id.* (internal citations and quotations omitted). After reviewing Alabama case law in great detail, the *Rudd* court explained that a plaintiff may establish a prima facie case under the AEMLD by presenting evidence "tending to exclude causes other than a manufacturing defect, and despite a lack of any direct evidence to identify a specific defect." *Id.* at 1346.

Oshkosh asserts that Plaintiffs have failed to present sufficient evidence that shows the existence of a manufacturing defect, and, thus, their AEMLD claim necessarily fails. (Doc. 82 at p. 13). According to Oshkosh, Miller's expert testimony is conclusory, speculative, and without a sufficient evidentiary foundation to create a genuine dispute of material fact. (*Id.* at p. 15). Plaintiffs maintain that they have

submitted substantial evidence of a manufacturing defect in the parking brake, consisting of Miller's expert testimony, as well as the testimony of Pickett and his assistant driver.  (Doc. 107 at p. 18).  The court agrees, as discussed below, with Plaintiffs that they have presented sufficient evidence of a manufacturing defect that creates a genuine dispute of material fact as to their AEMLD claim.

Oshkosh's own corporate representative testified that one of two events occurred to cause the HEMTT to roll down the hill and into the path of Plaintiffs' vehicle:  either the brakes were not applied or the parking brake was applied and did not "function properly."  (Doc. 108-8 at p. 6).  The testimony of Pickett and Clayton confirms that the HEMTT's parking brake was set before the accident occurred.  (Doc. 108-6 at pp. 3, 10; 108-7 at p. 3).  Upon his review of this testimony, Miller eliminated any possibility that the HEMTT rolled down the hill due to the parking brake not being set or any other intervening human interaction with the vehicle.

Oshkosh further contends that, based on Pickett's testimony, the accident was caused by his failure to place wheel chocks under the HEMTT.  Oshkosh's corporate representative, however, testified that: (1) the grade on which the vehicle was parked was "slight" and less than a 20 percent grade; and (2) wheel chocks were unnecessary as he would have expected the HEMTT to stay in place if the parking brakes had been applied.  (Doc. 108-8 at pp. 8-9).  Miller considered and rejected the theory that the

lack of wheel chocks in place caused the accident when he explained at this deposition that the wheel chocks were unnecessary on relatively level ground where brake systems similar to the one used by the HEMTT were working properly.  (Doc. 88-1 at 84).

Based on his experience in the commercial vehicle repair industry and review of the pertinent depositions, films, and reports, Miller provided a thorough explanation of the braking process in such a large commercial vehicle as the HEMTT and described in detail why the brake system in the HEMTT, given there is no evidence of human intervention, more likely than not failed due to a manufacturing defect caused by debris remaining in the braking system.  Miller specifically identified in both his report and affidavit that: (1) the spring brake valve failed by allowing compressed air into the spring brake chamber sufficient to release the spring brakes that were otherwise properly set and correctly applied by Pickett;" and (2) "this failure was the result of debris or other material that was allowed to remain in the brake system during the manufacture of the components of the spring brake system or in the assembly of the components."  (Doc. 111-9 at ¶ 5; Doc. 108-3 at ¶ 9).

Plaintiffs have also presented evidence showing that, when the HEMTT vehicle was inspected at the time of delivery to the Alabama National Guard around November of 2010, its spring brake valve was determined to be defective.  (Doc. 108-

2).  While no information was provided concerning the precise defect, the inspection report further indicated the following corrective action:  "Parts ordered by FSR 11-02-10 and installed."  (*Id.*).

Miller, in affidavit testimony, stated that the finding of a defective spring brake valve "is consistent with my opinion that the control system for the subject spring brake was defective and unreasonably dangerous and as a result allowed compressed air to be reintroduced into the brake chamber to release the brakes."  (Doc. 108-3 at ¶ 5).  Miller further indicated his belief that any problems associated with the pre-inspection spring brake valve were not adequately resolved based on his observation that the factory installed SR-7 valve "found to be defective during the pre-delivery inspection appears to be the same valve present at the time of my inspection."  (*Id.*).  According to Miller, "the SR-7 valve present on the HEMTT on April 29, 2011, is covered with the same factory-applied CARC paint covering the exterior of the HEMTT" and "there are no toolmarks present on the supply lines connecting to the SR-7 valve to indicate that the valve was replaced following the November, 2010 inspection when the spring brake valve was determined to be defective and not operating properly."  (*Id.*).

Because it characterizes Miller's opinions as speculative and conclusory, Oshkosh contends that such opinion testimony does not constitute substantial evidence

of a defect.  Oshkosh primarily relies on the Alabama Supreme Court's opinion in *Townsend*, *supra*, to support his contentions.  In *Townsend*, the Alabama Supreme Court affirmed summary judgment in favor of General Motors Corporation ("GM"), the truck manufacturer, despite undisputed facts demonstrating that "the air brakes on the truck failed and that the plaintiffs were injured as a result of that failure." *Townsend*, 642 So. 2d at 415.

The Alabama Supreme Court agreed with GM's argument that there was "no expert testimony (or any evidence for that matter) tending to show that the truck's brakes were defectively designed."  (*Id.*).  Neither one of the plaintiff's two expert witnesses noted anything defective or unreasonably dangerous with the design of the truck's brakes.  *Id.* at 416-18.  One expert, Fred Monick, provided the following testimony regarding whether there could have been a manufacturing defect in the air brakes:

Q:   What criticism, if any, do you have of [GM] in this case?

A.   Well, my criticism is something failed, there was another failure besides the push rod and, it could have been something that was defective as it left [GM's] hands.

Q.   You say something failed?

A.   Yes.

Q.   But you don't know what that is?

A.    As we sit here, I don't know what it is.

Q.    If I am understanding where you are going with this, Mr. Monick, you believe that this particular truck was unique in whatever malfunction may have happened?

A.    It could have had something, a part, a component was unique. It wasn't a design problem.

Q.    It's not a design problem?

A.    That's right.

Q.    Are you saying it's a manufacturing problem?

A.    It could have been a manufacturing problem.

Q.    Can you tell me what component would have been defectively manufactured?

A.    I can't tell you that as we sit here.

*Id.* at 417. Because Mr. Monick could not offer an explanation regarding the failure of the air brake at issue, the Alabama Supreme Court found that the plaintiff did not "present substantial evidence to establish a defective design under the AEMLD." (*Id.* at 418.

This case is factually distinguishable from the situation present in *Townsend*. Even though Mr. Monick hinted at the presence of a manufacturing defect, the issue in *Townsend* revolved around whether the plaintiffs could establish an AEMLD claim based on a defect in the design of the brakes. In contrast to the expert's pure

speculation in *Townsend* that the air brake's failure could have been caused by manufacturing defect, Miller specifically opines that the spring brake valve on the HEMTT failed and that its failure was the result of debris allowed to remain in the brake system.  In addition, Plaintiffs have presented evidence showing that one of the valves in the braking system was defective in the pre-delivery of the inspection of the HEMTT.  Through Miller's testimony, factual issues exist as to whether the defective valve was properly replaced before the accident on April 29, 2011, and whether the defective condition of the SR-7 valve had been resolved.[11]

When viewing the evidence and all justifiable inferences in favor of Plaintiffs, the court finds that they have presented substantial evidence of a manufacturing defect in the HEMTT's braking system.  The evidence submitted by Plaintiffs, including the expert testimony of Miller, tends to negate human involvement or interaction as a potential cause of the accident.  A reasonable juror could infer from the evidence presented that a manufacturing defect existed in the parking brake system of the HEMTT that was unreasonably dangerous and caused the HEMTT to roll down the

---

[11] In his reply brief, Oshkosh dismisses Miller's opinions regarding whether the defective valve was replaced as "disingenuous, speculative, and conclusory." (Doc. 120 at p. 9).  However, as discussed above, Miller's testimony has been determined to be admissible and Oshkosh's challenge to Miller's testimony goes toward its weight and not its admissibility.

hill even though the vehicle's parking brake had been set.  Accordingly, Oshkosh is not entitled to summary judgment with respect to Plaintiffs' AEMLD claim.

## Negligence and Wantonness

Plaintiffs claim that Oshkosh "negligently, recklessly, or wantonly researched, formulated, designed, manufactured, packaged, labeled, sold, distributed, inspected and/or repaired the HEMTT LHS vehicle, including the brake system and other component parts thereof, which is believed to have caused or contributed to cause the injuries and damages to" Plaintiffs.  (Doc. 67 at p. 6).  Under Alabama law, Plaintiffs' negligence and wantonness claims are distinct from their AEMLD claim.  *See Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.*, 901 So. 2d 84, 102 (Ala. 2004) (rejecting premise that AEMLD subsumes common-law tort actions of negligence and wantonness); *Spain v. Brown & Williamsson Tobacco Corp.*, 872 So. 2d 101, 105-06 (Ala. 2003) (explaining that AEMLD does not abrogate the common law, and that negligence and wantonness claims may be viable alternatives to an AEMLD claim).

"Under Alabama law, there are four elements to establish a case of negligence or wantonness: (1) duty, (2) breach of duty; (3) proximate cause, and (4) injury." *Edmonson v. Cooper Cameron Corp.*, 374 F. Supp. 2d 1103, 1106 (M.D. Ala. 2005) (citing *Spain*, 872 So. 2d at 104).  "A wantonness cause of action imposes similar requirements to a negligence claim, but with the enhanced culpability requirement that

the conduct be done recklessly or in conscious disregard of others' rights." *Raley v. Bank of America, N.A.*, No. 2:14-CV-857-WMA, 2014 WL 6684906, at *4 (N.D. Ala. Nov. 25, 2014) (citing *Edmonson*, 374 F. Supp. 2d at 1106). "A finding of wanton conduct depends upon circumstances, and must be based upon facts beyond mere negligence." *Rommell v. Automobile Racing Club of Am., Inc.*, 964 F.2d 1090, 1096 (11th Cir. 1992).

"The manufacture of a defective product may be deemed negligence *per se*; however, in the absence of a defective product, a manufacturer is liable under a negligence theory only if he has breached some duty of due care in the manufacture of the product. *Pearl v. Mad Engine, Inc.*, No. 7:12-cv-2850-TMP, 2015 WL 5179517 (N.D. Ala. Sep. 4, 2015) (citing *Atkins v. Am. Motors Corp.*, 335 So. 2d 134, 139–40 (Ala.1976)). In Alabama, a manufacturer has a duty to manufacture a product which is reasonably safe for its intended use and purposes. *See Ala. Power Co. v. Marine Builders, Inc.*, 475 So. 2d 168, 178 (Ala. 1985). "[W]hether a party breached a legal duty is a question of fact for the jury." *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1348 (11th Cir. 2007).

Seeking summary judgment against Plaintiffs as to their negligence and wantonness claims, Oshkosh contends that Plaintiffs "have no evidence, much less the substantial evidence required to avoid summary judgment, of any act or omission by

44

Oshkosh that proximately led to their injuries." (Doc. 82 at p. 22). Plaintiffs counter that "[t]he facts of this case are sufficient for a jury to infer that Oshkosh was negligent in its distribution, inspection and repair of the subject HEMTT. (Doc. 107 at p. 26). As discussed in the court's analysis of the AEMLD claim, Plaintiffs have offered substantial evidence of a manufacturing defect in the HEMTT's braking system that was unreasonably dangerous and caused the injuries suffered by Plaintiffs. Based on the evidence presented, a reasonable juror could infer that Oshkosh was negligent in connection with the manufacturing, inspection, and distribution of the HEMTT vehicle. Accordingly, Oshkosh is not entitled to summary judgment with respect to Plaintiffs' negligence claim.

Oshkosh also seeks summary judgment with respect to Plaintiffs' wantonness claim. (Doc. 82 at p. 21). Responding to the summary judgment motion, Plaintiffs advance arguments with respect to their negligence claim but do not address the issue of wantonness. (*See* Doc. 107 at pp. 24-26). Consequently, Plaintiffs' claim of wantonness is deemed abandoned, and Oshkosh is entitled to summary judgment on the claim of wantonness. *See Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n.2 (11th Cir. 2009) (explaining that plaintiff waived a claim by not addressing that issue in response to a summary judgment motion); *Marable v. Marion Military Institute*, 906 F. Supp. 2d 1237, 1260 (S.D. Ala. 2012) (recognizing that "[g]rounds

alleged in the complaint but not relied upon in summary judgment are deemed abandoned”).

### Combined and Concurring Claim

Plaintiffs claim in Count III that Oshkosh, Pickett, and other defendants “combined and concurred to proximately cause the Plaintiffs’ injuries and damages.” (Doc. 67 at p. 6).  The Alabama Supreme Court has held that “[w]here one is guilty of negligence and this negligence concurs or coalesces with the negligence of another, and the two combine to produce an injury, each is liable for damages, and the negligence of each is considered the proximate cause of the injury producing the damages.” *Williams v. Woodman*, 424 So. 2d 611, 613 (Ala. 1982).  In other words, “‘[j]oint tortfeasors’ are ‘those who act together in committing wrong, or whose acts if independent of each other, unite in causing [a] single injury.’” *Lowry v. Garrett*, 792 So. 2d 1119, 1122 (Ala. Civ. App. 2001) (quoting *Black’s Law Dictionary* 839 (6th ed. 1990)).  However, two defendants are not deemed to be “joint tortfeasors where the acts of the two defendants ‘did not combine to cause any one injury.’” *Id.* at 1123 (quoting *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 325 (Ala. 1999)).

Oshkosh contends that “there is no evidence that [its] acts . . . combined with the actions of the other defendants to cause the [Plaintiffs’] injuries.” (Doc. 82 at p.

19).  In addition to citing the lack of evidence of a defect in the HEMTT, Oshkosh blames Pickett's actions in failing to chock the wheel as the "but for" cause of the accident.  (*Id.*).  Plaintiffs simply contend that, based on the evidence provided in support of their summary judgment motions against both Oshkosh and Pickett, "their cause of action for combined and concurring negligence is to be sustained." Doc. 107 at pp. 26-27).

The court agrees with Oshkosh to the extent that it finds no evidence that the acts of Oshkosh with regard to the manufacturing, inspection, and distribution of the parking brake system combined with the actions of any other defendant, including Pickett, to cause Plaintiffs' injuries.   As discussed above, substantial evidence has been submitted to support Plaintiffs' assertion in opposition to Oshkosh's summary judgment motion that a manufacturing defect within the HEMTT's parking brake system caused the HEMTT to roll down the hill and strike Plaintiffs' vehicle.  The undisputed testimony of both Oshkosh's corporate representative and Mr. Miller indicates that the parking brake as set should have held the HEMTT in place where it was parked on level ground and that wheel chocks were unnecessary. (*See* Doc. 88-1 at 84; Doc. 108-8 at 8-9).   Accordingly, with respect to Plaintiffs' claim in Count III, Oshkosh's summary judgment motion is due to be granted.

**Government Contractor Defense**

47

Oshkosh asserts that it cannot be liable for Plaintiffs' injuries because it is entitled to the protection of the government (or military) contractor defense. (Doc. 82 at p. 20). The government contractor defense generally immunizes government contractors from civil liability arising out of the performance of federal procurement contracts. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505-06, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). In *Boyle*, the Supreme Court explained that the defense is: (1) a federal common law doctrine in which state law is preempted in certain situations because it presents a "significant conflict" with identifiable federal interests; and (2) designed to protect the exercise of discretion by government officers in "the selection of the appropriate design for military equipment to be used by our Armed Forces." *Id.* at 507, 511, 108 S.Ct. 2510.

In *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311 (11th Cir. 1989), the Eleventh Circuit analyzed *Boyle's* formulation of the government contractor defense and stated:

> The Court grounded the contours of the defense in the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), that protects the United States from liability for its agents' performance of duties involving discretionary decisions. Without the defense, the government's own tort immunity for its discretionary functions would be undermined. Contractors held liable for design features that were the subject of discretionary approval by the government would predictably pass on the costs of liability, ultimately imposing costs on the government that its immunity was intended to preclude.

48

The defense derives from the principle that where a contractor acts under the authority and discretion of the United States, it shares the sovereign immunity that is enjoyed by the government. In the military context, this immunity serves this further important purpose by shielding sensitive military decisions from scrutiny by the judiciary, the branch of government least competent to review them. Application of ordinary tort law to military design and procurement decisions is not appropriate, for the government is required by the exigencies of our defense effort to push technology toward its limit and thereby incur risks beyond those that would be acceptable for ordinary consumer goods.

*Harduvel*, 878 F.2d at 1315-16 (internal citation and quotations omitted).

With these principles in mind, the Supreme Court in *Boyle* formulated the government contractor defense as follows:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 101 L.Ed.2d 442. "The three conditions serve to ensure that the defense operates to immunize the contractor only where the government has actually participated in discretionary design decisions, either by designing a product itself or approving specifications prepared by the contractor." *Harduvel*, 878 F.2d at 1316. Because the government contractor defense is an affirmative defense, it is Oshkosh's burden to establish the conditions of the defense. *See Boyle*, 487 U.S. 514, 108 S.Ct. 2510. "[W]hether the facts establish the conditions of the defense is a question for the

jury, and summary judgment is only appropriate where the court finds no reasonable jury could find for the plaintiff on the facts presented. *Id.*

Oshkosh contends that it has satisfied all three elements of the government contractor defense. (Doc. 82 at pp. 20-27). Plaintiffs counter that: (1) the government contractor defense is not applicable to manufacturing defects; and (2) Oshkosh cannot satisfy the third element of the government contractor defense. (Doc. 107 at pp. 27-29). Before considering whether Oshkosh can satisfy *Boyle*, it is first necessary to address Plaintiffs' contention that the government contractor defense is not applicable to the manufacturing defect described in this case. As Plaintiffs point out, the government contractor defense set forth in *Boyle* applies only to defects in design. *Boyle*, 487 U.S. at 511, 108 S.Ct. 2510. It "'does not relieve suppliers of military equipment of liability in the manufacture of that equipment.'" *Harduvel*, 878 F.2d at 1317 (quoting *McKay v. Rockwell Int'l Corp.*, 704 F.2d 444, 451 (9th Cir. 1983)).

The Eleventh Circuit in *Harduvel* considered the applicability of the government contractor defense and the critical distinction between manufacturing and design defects. In *Harduvel*, a General Dynamics F-16 fighter aircraft, piloted by Captain Theordore Harduvel, crashed into a mountain ridge which resulted in the pilot's death. *Id.* at 1313-14. Captain Harduvel's widow subsequently brought suit against General Dynamics Corporation. According to the plaintiff's expert witnesses,

the F-16 "suffered a massive electrical failure that caused all of his flight instruments to malfunction." *Id.* at 1314.  These experts propounded the theory that:

> 'wire chafing' – the rubbing of wires in the electrical system against other wires, fasteners, or structural parts of the plane – caused electrical shorts, overheating, and fire in the 'right strake' of the aircraft, a forward extension of the wing located beneath and to the side of the cockpit." According to this theory, the electrical malfunction caused a loss of power to the plane's attitude indicators, the instruments that tell the pilot the position of his wings and whether the nose of the aircraft is pointed up or down.

*Id.*

At trial, the jury found in the plaintiff's favor on the claims that "defendant was negligent in designing the F-16, negligent in its manufacture, negligent in failing to warn, strictly liable for design and manufacturing defects in the aircraft, and strictly liable for failure to give adequate warnings." *Id.* at 1315.  The jury also determined that General Dynamics was not entitled to the government contractor defense. *Id.* The district court subsequently denied General Dynamics' motion for judgment notwithstanding the verdict ("JNOV") regarding the design and manufacturing defect claims, but set aside the verdict on the failure to warn claim." *Id.*  While noting that General Dynamics did not challenge the jury verdict on the government contractor defense, the district court observed that the defense "was unsuccessful." *Id.*  General Dynamics appealed, relying specifically on the government contractor defense. *Id.*

On appeal, the *Harduvel* court considered the plaintiff's "theory of wire chaffing and electrical failure as one involving defective manufacture." *Id.* at 1317.

> In determining whether a claimed defect is one of "design" for purposes of the government contractor defense, the proper focus is the protection of discretionary government functions for which the defense is intended. If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest. This distinction between "aberrational" defect and defects occurring throughout the entire line of products is frequently used in tort law to separate defects of manufacture from those of design. Stated another way, the distinction is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results.

*Harduvel*, 878 F.2d at 1317 (internal citation omitted).

Applying these principles, the Eleventh Circuit in *Harduvel* first concluded that the plaintiff's claim was one "of defective design for purposes of the government contractor defense." *Id.* This conclusion was based on expert testimony: (1) referencing "'product-wide' defects in the electrical system, and failure to follow design procedures to avoid the possibility of chafing"; and (2) relying on the fact that "wire chafing occurred in Harduvel's craft on chafing reports involving many different components of many different aircraft." *Id.* at 1318. Additional evidence was presented showing that "wire chafing was a problem with aircraft electrical systems that had long been known both in the industry and to the Air Force." *Id.* Thus, according to the Eleventh Circuit, the "[p]laintiff has depicted Harduvel's plane

not as an aberrational example of improper manufacture, but as a typical F-16 with a design that includes a potential for unwanted wire chafing." *Id.*

The Eleventh Circuit next concluded that the specific evidence relied on by the plaintiff did not serve to prove the existence of a manufacturing defect on the F-16 fighter plane. *Id.* at 1318-20. The Eleventh Circuit determined that: (1) the expert's testimony supported the "theory that F-16s generally were susceptible to some wire chafing" and failed to "identify any particular site of chafing on Harduvel's plane;" and (2) the failure to install a new "DC power panel" on Harduvel's aircraft was not a manufacturing defect since the Air Force had waived requiring the new panel to be installed on the aircraft.

The plaintiff further cited as a manufacturing defect a maintenance report of Harduvel's aircraft, dated one month before it was accepted by the Air Force, which described a protruding center screw that had caused some chafing damage. *Id.* The *Harduvel* court concluded that this evidence did not amount to a manufacturing defect because: (1) there was no evidence to indicate that any protruding screws had been improperly installed on Harduvel's aircraft; (2) protruding screws were a normal condition in the F-16; and (3) no evidence was presented showing either that any F-16 entered active service with this particular chafing problem or that "this type of wire chafing ever occurred on Harduvel's craft." *Id.* at 1319-20.

The *Harduvel* court held that the district court had committed error in denying the JNOV motion on the manufacturing defect claim because the plaintiff could not prove the "presence of a manufacturing defect on the F-16." *Id.* at 1320. After applying "the three conditions for the government contractor defense, the Eleventh Circuit ultimately concluded that the plaintiff's claims are "subject to the . . . defense, and that the record . . . establishes the conditions of the defense." *Id.* at 1320-22.

Rather than address the critical issue as to whether Plaintiffs' theory is based on either a design defect or manufacturing defect,[12] Oshkosh focuses its analysis on establishing the three elements articulated in *Boyle*. (Doc. 82 at pp. 23-29; Doc. 120 at 11-13). Indeed, Oshkosh has presented various documents to show that: (1) the United States Army set forth precise specifications for the HEMTT M1120 vehicle, which included ensuring that the HEMTT parking brake could hold on a 20% grade with the goal of being able to hold on a 40% grade  (Doc. 83-4 at 6-7); (2) the HEMTT conformed to the reasonably precise, government-approved specifications and passed all tests before delivery to the military, including various tests performed on the brakes and a final inspection report approved on June 1, 2009 (Doc. 83-4 at 9;

---

[12] In its reply brief, Oshkosh argues that Plaintiffs have conceded that the government contractor defense applies to design defect claims.  (Doc. 120 at p. 11).  While not disputing Oshkosh on this point, Plaintiffs steadfastly maintain that the defense is inapplicable with respect to the manufacturing defect identified by Mr. Miller.

Doc. 83-5; and Doc. 83-6); and (3) Oshkosh warned the U.S. Army in its operations manual about the failure to use wheel chocks on an incline.  (Doc. 83-8).

Miller has testified in both his deposition and his affidavit that: (1) a manufacturing defect, and not a design defect, was present in the HEMTT's braking system; and (2) the manufacturing defect was caused by debris remaining in the brake system that led to the failure of the spring brake valve.  (Doc. 88-1 at 93; Doc. 108-3 at ¶ 9).  "[W]hether a defect is properly designated as one of design or manufacture is not governed by a witness' choice of terminology."  *Harduvel*, 878 F.2d at 1317.  According to Plaintiffs, however, "[t]he presence of debris within the vehicle's air brake system is obviously an unintended phenomenon that is not part of the design configuration of the HEMTT" and, therefore, constitutes a manufacturing defect making the government contractor defense inapplicable.  (Doc. 107 at p. 28).

Oshkosh has pointed to no evidence establishing that the theory advanced by Miller is based on a generally defective design of the HEMTT's braking system as opposed to an "aberrational example of improper manufacture."  *See Harduvel*, 878 F.2d at 1317-18.  Even though the HEMTT evidently passed several government-approved tests on its braking system,  Plaintiffs have presented evidence that one of the valves in the braking system on the subject HEMTT was defective in the pre-delivery inspection.  (Doc. 108-2).  As discussed above,  Mr. Miller expressed his

55

opinion disputing whether the defective valve was properly replaced before the accident on April 29, 2011, and whether the defective condition of the valve had been properly resolved.  (Doc. 108-3 at ¶ 5).  Rather than proving the existence of a design flaw inherent in the braking systems of all HEMTT vehicles produced, the evidence adduced by Plaintiffs tends to focus on a particular defect in the subject HEMTT.[13] At a minimum, when the evidence and all justifiable inferences are viewed in favor of Plaintiffs, genuine disputes of material fact exist as to whether the claimed manufacturing defect is one of "design" for purposes of the government contractor defense.

With regard to the second condition of the *Boyle* test requiring the equipment to conform to the specifications approved, the Eleventh Circuit remarked that "[t]his prong involves essentially the same analysis that we have discussed with respect to the distinction between manufacturing and design defects."  *Harduvel*, 878 F.2d at 1321.  In other words,  "[t]o say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured."  *Id.*  Plaintiffs have submitted substantial evidence tending to support their assertion of a

---

[13] Miller testified in his affidavit that he was aware of other instances where debris within an air brake system had caused a malfunction in the spring brake valve and that this problem resulted in a recall campaign.  (Doc. 108-3 at ¶ 10).  Miller, however, did not indicate whether it was common among large military vehicles like the HEMTT to have a malfunction of the spring brake valve.

manufacturing defect in the HEMTT's braking system. This evidence allows for the conclusion that Plaintiffs' claims are not subject to the government contractor defense. The issue as to whether the government contractor defense applies may be revisited at trial after all of the evidence has been presented. However, Oshkosh is not entitled to summary judgment on this issue at this time.

## IV. CONCLUSION

Based on the foregoing analysis, it is ORDERED that Oshkosh's *Daubert* motion to exclude Miller's testimony (Doc. 86) and its motion to strike Miller's affidavit (Doc. 121) are DENIED. It is further ORDERED that Oshkosh's motion for summary judgment is GRANTED in part and DENIED in part. The summary judgment motion is GRANTED as to Plaintiffs' claim of wantonness in Count II of the First Amended Complaint and their "combined and concurring" claim in Count III of the First Amended Complaint. The summary judgment motion is DENIED in all other respects.

DONE this 4th day of March, 2016.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE